UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| v. | : CIVIL ACTION |
| CHARLES J. MARQUARDT, | : NO. |
| Defendant. | : |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following against defendant Charles J. Marquardt ("Marquardt"):

## SUMMARY

1. In June 2008, Marquardt, then a senior vice president of the Evergreen Investment Management Company, LLC ("Evergreen"), engaged in insider trading in the shares of the Evergreen Ultra Short Opportunities Fund (the "Ultra Fund" or the "Fund"), a mutual fund for which Evergreen served as the investment adviser. More specifically, on June 11, 2008, Marquardt learned the Ultra Fund was facing problems that might cause it to be closed. The next day, Marquardt redeemed all of the Ultra Fund shares he owned and caused a member of his family to do the same. On June 19, 2008, Evergreen publicly announced that the Ultra Fund's Board of Trustees had approved a plan to liquidate the fund. By redeeming when they did, Marquardt and his family member avoided losses of approximately $4,803 and $14,304 respectively.

2. By engaging in the conduct described herein, Marquardt violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Accordingly, the Commission seeks the following relief against Marquardt: (i) entry of a permanent injunction prohibiting Marquardt from violating Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; (ii) disgorgement of the losses avoided by Marquardt and his family member, plus prejudgment interest thereon; and (iii) the imposition of a civil monetary penalty.

## JURISDICTION

3. The Commission brings this action pursuant to the enforcement authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. §§ 77t(b)] and Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1]. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(e), 21A and 27 of the Exchange Act [15 U.S.C. §§ 78u(e), 78u-1 and 78aa]. Additionally, the acts alleged herein occurred within the District of Massachusetts, which is also where Marquardt resides.

4. In connection with the conduct described in this Complaint, Marquardt directly or indirectly made use of the means or instrumentalities of interstate commerce, of the mails, of the facilities of a national securities exchange, and/or of the means and instruments of transportation or communication in interstate commerce.

5. Unless enjoined, Marquardt will continue to engage in the acts, practices, transactions and courses of business alleged herein, or in acts, practices, and courses of business of similar object and purpose.

**DEFENDANT AND RELEVANT ENTITY**

6.      **Marquardt**, age 42, of Cambridge, Massachusetts, was employed by Evergreen or one of its affiliates from April 1998 to April 2009.  Beginning in 2002, Marquardt served as a senior vice president and the chief administrative officer for operations of Evergreen.  From April 1998 through April 2009, Marquardt was a registered representative of Evergreen Investment Services, Inc., an affiliated broker-dealer.

7.      **Evergreen**, headquartered in Boston, Massachusetts, is the registered investment adviser for the Evergreen family of mutual funds, including the Ultra Fund.  During the relevant period, Evergreen was a wholly-owned subsidiary of Wachovia Corporation and currently is a wholly-owned subsidiary of Wells Fargo & Company.

**FACTUAL BACKGROUND**

8.      The Ultra Fund was a mutual fund that invested primarily in commercial and residential fixed and variable rate mortgage-backed securities, including collateralized mortgage obligations, collateralized debt obligations, and other mortgage-related investments.  Given the nature of the securities held by the Ultra Fund, there was no market price readily available for many of the Fund's holdings.

9.      The policies established by the Ultra Fund's Board of Trustees entrusted the valuation of those Fund holdings for which market prices were not readily available to the Evergreen Valuation Committee (the "EVC") with oversight by the Board's Audit Committee.  The process for "fair valuing" these Ultra Fund holdings was critical to the proper calculation of the Fund's per share net asset value ("NAV").

10.     The EVC valued securities held by the Ultra Fund using one of three methods.  Under the first method, securities were priced in accordance with values provided by a third-

party pricing vendor, such as Standard & Poor's, PricingDirect, Interactive Data Corporation, and Reuters.  Under the second method, securities were priced in accordance with values provided by one or more third-party broker-dealers.  Under the third method, securities were priced in accordance with the values recommended by the Ultra Fund's portfolio management team.

11.     Since August 2007 at the latest, the EVC opted to value certain securities held by the Ultra Fund in accordance with values provided by a single broker-dealer or recommended by the Fund's portfolio management team even though values from a third-party pricing vendor, which were almost always lower, were available.  The decision to value a security in this manner was referred to as a "vendor override."

### Marquardt Acquires Material, Nonpublic Information Concerning the Ultra Fund

12.     On the afternoon of June 10, 2008, Marquardt attended a meeting of the EVC that focused on the question of how to value the interest that the Ultra Fund owned in a particular security that was no longer generating a cash flow.

13.     The EVC decided to lower the value of this security to $0, which in turn decreased the Ultra Fund's NAV by nearly ten cents.

14.     From at least as far back as February 1, 2007, the NAV of the Ultra Fund had never changed by more than four cents on a single day.

15.     Evergreen posted the Ultra Fund's revised NAV in the late afternoon or early evening of June 10.  However, this NAV posting was not accompanied by any explanation concerning the reasons behind the NAV drop.

16.     On the morning of June 11, 2008, Marquardt attended a meeting of several top staff from Evergreen and others concerning the June 10 drop in the Ultra Fund's NAV.  In the

course of this meeting, the following possible scenarios were discussed, none of which had been disclosed to the general public:

- the June 10th NAV drop might spark the redemption of a significant number of Ultra Fund shares over the next several days;

- if the Ultra Fund had to sell certain of its holdings over the next several days to meet redemptions, it might have to do so at prices substantially below the values the Fund had assigned to those holdings, which might cause the Fund's NAV to decrease further;

- an additional decrease in the Ultra Fund's NAV might trigger even more redemptions and thus set off a cycle of further NAV drops and further redemptions;

- the Ultra Fund might soon stop its practice of vendor overrides;

- if the Ultra Fund no longer engaged in vendor overrides, the resulting re-pricings could further lower the Fund's NAV; and

- the Ultra Fund might have to be closed in the very near future.

**Marquardt Trades on Material, Nonpublic Information Concerning the Ultra Fund and Causes A Family Member To Do the Same**

17. At 7:22 a.m. on June 12, 2008, Marquardt placed an order to redeem all of the approximately 4,213 Ultra Fund shares that he owned. This was the first trade Marquardt had made in the Ultra Fund in two years. Because the Ultra Fund's NAV was $8.62 as of June 12, Marquardt's redemption order generated proceeds of about $36,000.

18. Less than five minutes before placing his redemption order, Marquardt made a telephone call to a family member. At approximately 9:04 a.m. the same day, this family member placed an order to redeem all of the approximately 12,547 shares that the family member owned in the Ultra Fund. This redemption order placed by Marquardt's family member generated proceeds of about $108,000.

**The Ultra Fund Shuts Down**

19. In the days following Marquardt's trades, consistent with some of the scenarios discussed at the June 11 meeting, the Ultra Fund stopped engaging in vendor overrides and the resulting downward re-pricings led to significant drops in the Fund's NAV from June 12 through June 18 totaling $1.14.

20. On June 19, Evergreen publicly announced that the Ultra Fund's Board of Trustees had approved a plan to liquidate the Ultra Fund. Evergreen also announced that shareholders of record as of June 18, would receive a cash distribution of $7.48 per share based on the Fund's NAV at the close of business on that date, and that shares of the Fund would no longer be available for purchase.

21. By redeeming their Ultra Fund shares on June 12, Marquardt and his family member had avoided losses of $4,803 and $14,304, respectively.

**Marquardt Breached His Fiduciary Duty to Evergreen**

22. At all relevant times, Marquardt was a senior vice president of Evergreen, the investment adviser to the Ultra Fund, and consequently, he had a fiduciary duty to Evergreen not to trade in the Ultra Fund while in possession of material, nonpublic information about the Fund. Marquardt was also subject to Evergreen's insider trading policy, which prohibited him from trading in any Evergreen fund, including the Ultra Fund, while in possession of material, nonpublic information.

23. Marquardt knew or was reckless in not knowing that when he redeemed his Ultra Fund shares and caused his family member to do the same while he was in possession of material, nonpublic information concerning the Ultra Fund's difficulties, he was violating his fiduciary duty to Evergreen.

## CLAIMS FOR RELIEF

### First Claim for Relief
### (Violation of Section 17(a) of the Securities Act)

24. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 23 of the Complaint as if set forth fully herein.

25. By reason of the foregoing, Marquardt, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instruments of transportation or communication in interstate commerce or of the mails, in the offer or sale of securities: (a) employed a device, scheme or artifice to defraud; (b) obtained money or property by means of an untrue statement of material fact or omitting to state a material fact necessary to make the statement made, in light of the circumstances under which it was made, not misleading; or (c) engaged in a transaction, practice or course of business which operated as a fraud or deceit upon other persons, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### Second Claim for Relief
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)

26. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 23 of the Complaint as if set forth fully herein.

27. By reason of the foregoing, Marquardt, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) employed a device, scheme or artifice to defraud; (b) made an untrue statement of material fact or omitted to state a material fact necessary to make the statement made, in the light of the circumstances under which it was made, not misleading; or (c) engaged in an act, practice or course of business which operated as

a fraud or deceit upon other persons, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court issue a Final Judgment:

A. Permanently enjoining Marquardt from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

B. Ordering Marquardt to disgorge his loss avoided as well as the loss avoided by his family member, plus prejudgment interest thereon;

C. Ordering Marquardt, pursuant to the Insider Trading Sanctions Act of 1984, codified at Section 21A of the Exchange Act, as amended [15 U.S.C. § 78u-1], to pay a civil monetary penalty;

D. Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION,**

By its attorneys,

 /s/ Luke T. Cadigan
Luke T. Cadigan (BBO# 561117)
  Senior Trial Counsel
Kevin M. Kelcourse (BBO# 643163)
  Branch Chief
Daniel P. Barry (BBO # 564037)
  Senior Counsel
33 Arch Street, 23rd Floor
Boston, MA  02110
(617) 573-8919
(617) 573-4590 fax

Dated:   January 20, 2010